UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

MEGAN KING,

    Plaintiff,

    v.

RELIANCE STANDARD LIFE
INSURANCE COMPANY,

    Defendant.

Case No. 1:23-CV-443-GSL

## OPINION AND ORDER

This is an ERISA case in which Plaintiff, Megan King ("King"), asserts that her long-term disability benefits were wrongfully terminated by Defendant, Reliance Standard Life Insurance Company ("Reliance"), the insurance company providing benefits to employees of Medtronic, King's former employer. The parties have filed cross-motions for judgment on King's claim for plan benefits pursuant to 29 U.S.C. § 1132(a)(1)(B). [DE 38 & 39]. The motions are fully briefed and ripe for ruling.[1]

## I. BACKGROUND[2]

King worked as a Senior Care Specialist for Medtronic. [DE 39, ¶ 4]. In August 2018, King was diagnosed with acromegaly when doctors discovered a pituitary adenoma growing on her brain. [*Id*. at ¶ 15]. Shortly thereafter, King underwent a pituitary hypophysectomy. [DE 38 at ¶ 10]. Due to King's medical condition, she sought disability benefits through Medtronic. [DE 38 at ¶ 4].

---

[1] A hearing on the motions was held on October 22, 2025. [DE 49].

[2] The parties have stipulated, for purposes of these cross-motions for judgment, that there are no disputes as to any material fact. [DE 50, 4:1-21]. The Court also notes that given the lack of factual dispute here, it will pull from both parties' statements of material facts.

**A. The Policy**

Reliance delivered a group long term disability policy (hereinafter referred to as "Policy") to Medtronic. [DE 38 at ¶ 1].  King, as an employee of Medtronic, was covered under the Policy. [DE 38 at ¶3; DE 39 at ¶6]. The Policy "provides income replacement benefits for Total Disability from Sickness or Injury" to eligible Medtronic employees. [*Id*. at ¶ 2].  More specifically it explains that Reliance "will pay a Monthly Benefit if an Insured: (1) is Totally Disabled as the result of a Sickness or Injury covered by this Policy; (2) is under the regular care of a Physician; (3) has completed the Elimination Period; and (4) submits satisfactory proof of Total Disability to us." [DE 37 at 18; DE 38 at ¶ 52].  The "Monthly Benefit will stop on … the date the Insured fails to furnish the required proof to Total Disability." [DE 37 at 19; DE 38 at ¶ 32].

The Policy defines "Total Disability" or "Totally Disabled" to mean "that as a result of an Injury or Sickness[] … during the Elimination Period[3] and for the first 12 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her Regular Occupation[, which is] … the occupation the Insured is routinely performing when Total Disability begins[.]" [DE 37, pg. 10; DE 38 at ¶¶ 5, 7].

The Policy goes on to explain that "after a Monthly Benefit has been paid for 12 months, an Insured [is considered Totally Disabled if he or she] cannot perform the material duties of Any Occupation." [DE 37, pg. 10; DE 39 at ¶ 1].  "Any Occupation is one "normally performed in the national economy for which an Insured is reasonably suited based upon his/her education, training or experience." [DE 37 at 9; DE 39 at ¶ 2].  The Policy further "consider[s] the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties

---

[3] The Elimination Period is "26 consecutive weeks of Total Disability" that "begins on the first day of Total Disability" and "for which no benefit is payable." [DE 37 at 7, 9; DE 38 at ¶ 6].

on a part-time basis or part of the material duties on a full-time basis." [DE 37, pg. 10; DE 39 at ¶ 1].

The Policy also provides for "Monthly Benefits for Total Disability caused by or contributed to by mental or nervous disorders." [DE 38 at ¶ 28]. However, those benefits are "not [] payable beyond an aggregate lifetime maximum duration of twelve (12) months unless the Insured is in a Hospital or Institution at the end of the twelve (12) month period." [*Id*. at 28]. Under the Policy, mental or nervous disorders include "depressive disorders" and "anxiety disorders." [*Id*. at ¶ 29].

### B. The Claim History

King's last documented day of work for Medtronic was on August 7, 2018. [DE 38 at ¶ 4]. First, she applied and was approved for the maximum period of short-term disability benefits under the Policy. [DE 39 at ¶8]. Her claim then transitioned to one for long-term disability, which Reliance approved on February 15, 2019. [*Id*. at ¶9; DE 38 at ¶15]. King's monthly long-term disability benefit payments commenced on February 6, 2019. [DE 38 at ¶ 16].

Reliance conducted periodic reviews of King's claim. [DE 38 at ¶ 19-21]. Effective February 6, 2020, King's claim had been paid for 12 months, which, under the Policy, King was no longer considered unable to work in her "Regular Occupation", but now she was considered unable to work in "Any Occupation." [*Id*. at ¶ 22-23].

On August 17, 2022, Reliance conducted one of its regular reviews of King's claim. [DE 38 at ¶ 25-26]. It concluded that "[t]here [wa]s no indication of an impairing physical condition[, because] there [wa]s no indication of residual or recurrent pituitary adenoma." [*Id*.]. This determination was made using updated records provided by Dr. Jakacki, King's primary care physician, and Anna Ryan, King's neurosurgical advanced practice nurse. [*Id*. at ¶ 25]. As a result, on September 23, 2022, Reliance informed King that as "of August 17, 2022, [it] ha[d] no medical

3

evidence to support [her] inability to perform sedentary occupations due to recurrent or residual pituitary adenoma …" [*Id*. at ¶ 33].  Therefore, at that point, Reliance did not consider King's physical condition to be "Totally Disabl[ing]". [DE 39 at ¶ 10].

In that same letter, however, Reliance explained that "based on the updates from additional healthcare providers, there is evidence of impairment due to major depression and anxiety disorder … [and therefore,] [m]edical documentation supports [King's] lack of consistent work function due to psychiatric symptoms beginning on August 17, 2022." [DE 38 at ¶¶ 34, 36].  Since King was now being awarded benefits only due to her "mental or nervous disorder", Reliance informed her that her claim "benefits w[ould] [] terminate upon completion of 12 months, or August 17, 2023." [*Id*. at ¶ 37].

On July 28, 2023, less than a month before benefits for her mental condition were set to expire, King appealed Reliance's 2022 decision to terminate her long-term disability benefits for her physical condition. [DE 38 at ¶ 39].  King requested that Reliance "overturn the denial and make a favorable decision on [her] claim for long-term disability benefits due to *physical* disability." [*Id*. at ¶ 40] (emphasis added). In support of her appeal, she provided Reliance with updated medical records, a Vocational Evaluation, and a favorable Social Security disability determination. [*Id*. at ¶ 41- 43].

Reliance did not issue a decision nor provide a written notice of extension within the 45-day period mandated by the Department of Labor's ERISA Claims Procedure Regulations. [4] [DE 39 ¶ 13].  Reliance has acknowledged that the appeal was not timely decided. [DE 38 at ¶ 50].

---

[4] Under DOL Regulations, "the plan administrator shall notify the claimant … of the plan's adverse benefit determination [or the special circumstances warranting an extension] … 45 days after receipt of the claim by the plan." 29 C.F.R. § 2560.503-1(f)(3).  Failure to do so results in the "administrative remedies available under the plan [exhausted]." § 2560.503(1)(2).

Therefore, the administrative remedies available to King were deemed exhausted on September 14, 2023. [DE 39 at ¶ 14; DE 26 at pg. 5].

### C. Summary of Medical Conditions[5]

As stated above, in August 2018, King was diagnosed with acromegaly, for which she underwent a pituitary hypophysectomy. [DE 39 at ¶ 15; DE 38 at ¶10]. The surgery was successful insofar as the pituitary edema was completely removed from her brain with no recurrence or regrowth between October 2019 and September 2022. [DE 39 at ¶17]. Despite the successful surgery, King went on to develop chronic and debilitating issues related to the removal including severe fatigue, cognitive dysfunction and impairments, and frequent headaches. [*Id*. at ¶¶ 18, 23]. King also suffered from panhypopituitarism, adrenal insufficiency, and multiple hormonal deficits, including Adrenocorticotropic hormones (ACTH), Thyroid-stimulating hormones (TS), Pregnenolone, and DHEA. [*Id*. at ¶ 19-20]. These diagnoses also contributed to her chronic fatigue, headaches, and some of her cognitive dysfunction. [DE 39 at ¶ 20].

King's medical care has mainly been managed by her primary care physician, Dr. Peter Jakacki beginning in 2019. [DE 39 at ¶ 25]. Her neurocognitive disorder, resulting from the pituitary resection, has been managed by her treating psychologist, Dr. Tamara Lombard. [*Id*. at ¶ 31]. The types of treatment that King has undergone to treat her various physical conditions included "rehab treatment for strength mobility and coordination deficits[,]" and hormone replacement medications and therapies. [DE 38 at ¶ 13; DE 39 at ¶ 26].

---

[5] King filed a Motion to Exclude Post-Exhaustion Evidence from ERISA Record [DE 21] on April 22, 2024. There, she requested that the Court limit the ERISA record to only evidence submitted before the claim was deemed exhausted on September 14, 2023. *See generally* [DE 21]. The Court granted her request, and for the reasons discussed therein, limited the ERISA record to evidence gathered and submitted before the claim was deemed exhausted. *See generally* [DE 26]. The Court, on Reliance's Motion to Reconsider [DE 35], affirmed its decision to limit, or "close", the record. *See* [DE 35]. Accordingly, the relevant evidence for purposes of this discussion is that generated on or before September 14, 2023.

King also suffers from mental medical conditions including Major Depressive Disorder, Social Anxiety Disorder, and Post-Traumatic Stress Disorder. [DE 38 at ¶ 57, 100]. For those conditions, King received therapy from Dr. Lombard as well as medication from Dr. Jakacki. [*Id.* at ¶ 31].

## II. LEGAL STANDARD

At the outset, the Court would like to note that King has moved for judgment pursuant to Federal Rule of Civil Procedure 56(c)[6] while Reliance is seeking judgment under Federal Rule of Civil Procedure 52.  Although the legal standards for which they are moving under differ, the determination the parties are asking the Court to make is the same: Whether King, at all revenant times, was considered "Totally Disabled" under the Policy, and is therefore entitled to long-term disability benefit payments.

For the sake of thoroughness, the Court will address each standard in turn. A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if, under the relevant substantive law, it is outcome determinative. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A dispute over a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In deciding a motion for summary judgment, the court may "not weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the

---

[6] Although King has stated that she is moving pursuant to Federal Rule of Civil Procedure 56(c), she supports her argument with cases that applied Federal Rule of Civil Procedure 52 standard. [DE 39 at 12].  For example, she cites *Dorris v. Unum Life Insurance Company of America*, 949 F.3d 297 (7th Cir. 2020), and quotes Rule 52 standard of review: "[t]he court can limit itself to deciding the case on the administrative record …" [*Id.*].

The Court also notes that King is requesting that the Court "either (1) award benefits for physical disability from August 17, 2022 [*sic*], through the date of judgment or (2) award benefits fro physical disability from August 17, 2022 [*sic*], through September 14, 2023 – the date [] King's claim was deemed exhausted." [DE 39 at 35].

facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Instead, the court's only task is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* (internal citation omitted). If there is no genuine dispute of material fact, then summary judgment is appropriate, and the movant is entitled to judgment as a matter of law. *Id.*

Federal Rule of Civil Procedure 52 is known as a "paper trial, which allows the district court to resolve the dispute without a formal trial by making findings of fact and conclusions of law based on the administrative record". *Oye v. Hartford Life & Accident Ins. Co.*, 140 F.4th 833, 836 (7th Cir. 2025) (internal citations omitted). The Seventh Circuit has recognized Rule 52(a) as one that is "well-suited to ERISA cases in which the court reviews a closed record." *Fontaine v. Metro. Life Ins. Co.*, 800 F.3d 883, 885 (7th Cir. 2015). And, as noted previously, the record, here, is closed. *See* [DE 26, 35].

Regardless of the differing procedural vehicles chosen by the parties, the standard of review, being *de novo*[7], is common to both, meaning that "[in an ERISA context] the court can and must come to an independent decision on both the legal and factual issues that form the basis of the claim." *Diaz v. Prudential Ins. Co. of Am.,* 499 F.3d 640, 643 (7th Cir. 2007). This means, that the issue before the Court is whether King is entitled to long-term disability benefits under the Policy. *Id*. at 643. Narrowing the issue even further, the parties have recognized that question before this Court "ultimately boils down to whether [] King[,] on the record as it existed as of September [20]23 has established by a preponderance of the evidence that she remain[ed] disabled

---

[7] The Court has previously determined, and the parties have acknowledged, that the correct standard of review in this case is *de novo* because Reliance failed to timely render a decision on King's administrative appeal. *See* [DE 26 at 2-5]; [DE 38 at ¶ 50]; [DE 39 at 29]; *see also* 29 C.F.R. § 2560.503-1; *Fessenden v. Reliance Standard Life Ins. Co.*, 927 F.3d 998, 1001 (7th Cir. 2019) (holding that "when an administrator fails to render a [timely] final decision, there is no valid exercise of discretion to which the court can defer, and it decides *de novo* whether the insured is entitled to benefits").

from any occupation … on a full time basis as a result of her *physical condition*."[8] [DE 38 at ¶ 51]; [DE 39 at 30]; [DE 50 at 7:23-25, 8:1-3] (emphasis added).

### Discussion

Before weighing the evidence in this case and determining whether King is entitled to long-term disability benefits under the Policy, the Court highlights that neither party is disputing the fact that King is disabled. Instead, King is arguing her debilitating symptoms are a result of a physical condition while Reliance claims that King's mental condition is the actual cause. *See* [DE 45-1 at 17] (explaining that "[w]hile Reliance Standard does not dispute that Plaintiff may have been disabled beyond August 17, 2022 [*sic*], the record clearly establishes that she was not Totally Disabled solely form a physical cause"); *see also* [DE 50 at 5:2-14] (agreeing that "the dispute before the Court is really the interpretation of [] medical records").

Additionally, because this Court is tasked with making an independent determination of benefits based on the record before it, the basis for which Reliance decided to confer or withhold benefits from King is irrelevant. *See Dorris v. Unum Life Ins. Co. of Am.*, 949 F.3d 297, 304 (7th Cir. 2020) (explaining "that what happened before the plan administrator is irrelevant in a de novo review case"). Therefore, since King is asking the Court to find that she was totally disabled beginning on August 17, 2022, the date Reliance determined that the medical evidence no longer supported a finding of an impairing physical condition, through September 14, 2023, the close of the Administrative Record, the Court's focus must be on the objective evidence generated during that period. Said another way, to determine if King's debilitating symptoms were caused by her physical condition between August 17, 2022 and September 14, 2023, administrative record evidence outside of that timeframe will not be given little weight.

---

[8] Both parties agree that King has already received the aggregate lifetime maximum amount of benefit payments for a "mental or nervous disorder" under the Policy. *See* [DE 44 at ¶¶ 28, 37]; [DE 50 at 15:14-22].

King suffers from cognitive impairments and chronic fatigue, which she is alleging is caused by her diagnoses of acromegaly, panhypopituitarism, adrenal insufficiency, and multiple hormonal deficits (hereinafter referred to as "physical conditions"). [DE 39 at ¶¶ 15, 19-20].  King suggests that the following objective evidence supports her position: treatments notes from Dr. Jakacki, her treating physician, and Dr. Lombard, her treating psychologist, as well as 2023 medical opinion forms authored by her treating doctors and nurse consultants employed by Reliance, a vocational evaluation, and an award of Social Security Disability Benefits. [DE 39 at 31].  Reliance argues that this very same evidence shows a lack of connection between her debilitating symptoms and her physical condition. *See* [DE 45-1 at 16].

**I. Treatment Notes**

*A. Dr. Jakacki*

As stated above, Dr. Jakacki began treating King in 2019, a few months following her pituitary hypophysectomy. [DE 39 at ¶ 25].  Dr. Jakacki's treatment records between 2022 and 2023 reveal that King suffered from various hormonal deficits. [DE 39 at 13].  King argues that Dr. Jakacki has found that "these hormonal deficits directly contribute to [her] fatigue and negatively affect her overall physical and cognitive health." [*Id.*].  The records she cites to for this proposition consist only of two visits. *See* [*Id.*] The first being one that occurred on April 18, 2023, where King's "Chief Complaint" was Covid and prediabetes. [DE 37-9 at 1015][9]. During that visit, though mainly spent discussing her Covid diagnosis and relevant treatment, Dr. Jakacki noted, in pertinent part, that:

> [King's] ACTH level dropped form 6 in 10/22 down to less than 5 on 4/4/2023 consistent with pituitary surgery and secondary adrenal insufficiency[,] … [her] cortisol level did increase from 15.4 in 10/22 up to 17.2 on 4/4/2023 which is a very reasonable level considering her hydrocortisone dose … [her] DHEA-sulfate level

---

[9] Due to the way the Administrative Record was paginated, making it difficult to read, the Court will refer to the pages of the Administrative Record by the corresponding docket entry number.

dropped dramatically from 401 in 10/22 down to 17 on 4/4/2023 which is grossly low[, as] normal [is between] 23-266[, h]er DHEA unconjugated level dropped from 373 in 10/22 down to 17 on 4/4/2023 with normal between about 345 [and] 2023 … [and] [h]er Pregnenolone dropped dramatically from 102 in 10/22 down to 23 on 4/4/2023 and I would like it between 80 and 160.

[DE 37-9 at 1017].   As a result, Dr. Jakacki increased her pregnenolone supplement and instructed King to "go back on DHEA" for the decrease in those levels as "[a]pparently she was off [DHEA supplements] totally for about 2 weeks before the test as she had stopped it because she was breaking out …"  [*Id*. at 1018].

The second visit that King relies on is one that occurred just a week later, on April 26, 2026. [DE 39 at 30].  The "Chief Complaint" for that visit was hormone-related as well as diabetes. [DE 37-9 at 1022].  In addition to restating his findings from the April 18, 2023 visit, Dr. Jakacki noted that:

[h]er estrogen level improved from 59.7 in 1/21 up to 68.2 on 10/11/2021 and then was 157.6 in 10/22 before dropping to 50.8 on 4/4/2023 which is a notable drop. Her progesterone level dropped from 1.7 in 1/21 down to undetectable or 0.2 on 10/11/2021 and then went up to 1.2 in 10/22 and is now 0.2 on 4/4/2023 … [Her] testosterone level plummeted from 61 in 10/22 down to 2 on 4/4/2023 and her testosterone dropped from 1.6 in 10/22 down to 0.1 on 4/4/2023.

[DE 37-9 at 1023]. Dr. Jakacki "strongly suspect[ed]" that her testosterone level drop was "because she had stopped the DHEA and [that] the reduction in the Pregnenolone level [was] probably stress related." [*Id*. at 1024]. His suggested course of treatment was for her to continue her prescribed medications, including hormone supplements, and to check her hormone levels "every 6 mo[nths]." [*Id*. at 1026].

King argues that the records from the two visits discussed above, reveal that Dr. Jakacki found her hormonal deficits to be the cause of her disabling condition[10]. [DE 39 at 30].  However,

---

[10] At the hearing, counsel for King pointed to a March 31, 2021 treatment note authored by Dr. Jakaki, where he opined that "[King's] fatigue is multifactorial with a component of hormone change which has been quite dramatic

10

the only statement within those records that could possibly indicate such is Dr. Jakacki's recitation of King explaining to him that she "[f]eels like she is walking through [*sic*] mud and is so tired – some before and worse after COVID-19. Body feels worn out. Has to take naps daily for 3 h[ours] or more. Takes everything she has to get up and give her grandpa dinner and her body hurts. Brain does not function well and she cannot think anymore." [DE 37-9 at 1022]; *see also Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004) (reminding that that "[m]ost of the time, physicians accept at face value what patients tell them about their symptoms …").  There is nothing in these treatment notes that connect her reported fatigue to her hormonal deficits.

Reliance argues that Dr. Jakacki's treatment notes, during the relevant time, produce unremarkable findings, and importantly "do not reflect any neurocognitive testing …" which would be necessary "to establish that any limitations that [King has, were] … derived from a cognitive impairment rather than a mental or nervous disorder." [DE 38 at 33]. Reliance also argues that King's reliance on Dr. Jakhaki's treatment notes that show a decline in various hormones is misplaced because those tests are only indicative of "objective diagnostic evidence, and diagnoses [such as low hormone levels] are not proof of actual limitations." [DE 45-1 at 19] (*citing Houston v. Provident Life & Accident Ins. Co.*, 390 F.3d 990, 996 (7th Cir. 2004) (holding that "the MRI merely aided the diagnosis of a herniated disc, and the record offers insufficient objective documentation that this medical condition rendered [the plaintiff] unable to … work").

Looking to the April 3, 2023 visit, King's chief complaint was "[p]lane phobia/panic/claustrophobia and questions about right renal atrophy." [DE 37-9 at 485].  Nothing in the notes from that visit contemplate King's hormonal deficits or relating physical condition.

---

…" [DE 37-9 at 954]; [DE 50 at 50:21-23]. However, this treatment note is from outside of the relevant timeframe, and the Court does not find it necessary to consider it.

*See generally* [*Id*. at 485-491].  Instead, it references her memory issues under the "psychiatric" heading of Dr. Jakacki's exam findings as follows:

> Psychiatric: normal mood and affect for her with much anxiety with recent and remote memory impaired.

[DE 37-9 at 486].  Similarly, the April 18, 2023 treatment note states, in pertinent part:

> Psychiatric: normal mood and affect for her – easily overwhelmed and anxious with recent and remote memory impaired with cognitive slowing as has been typical of her.

[DE 37-9 at 497]. And, finally the April 26, 2023 treatment note states, in pertinent part:

> Psychiatric: anxious and easily overwhelmed with recent and remote memory poor. Has cognitive slowing with difficulty following all that I said.

[DE 37-9 at 504]. Therefore, Reliance argues, and the Court agrees, that Dr. Jakacki's treatment records appear to "link [King's] reported memory and cognitive symptoms to her psychiatric condition, not a physical cause." [DE 45-1 at 18].

While the Court recognizes that the burden does not rest only with King to prove her entitlement to benefits, as cross-motions of judgment are at play, the Court is inclined to agree with Reliance that nothing in Dr. Jakacki's treatment notes establish that her physical condition[11] is the cause of, or substantially contributes to, her cognitive dysfunction and chronic fatigue. *See Diaz*, 499 F.3d at 643. The Court also notes that a finding that King's symptoms are a result of her mental conditions is not necessary as the benefits for mental conditions under the Policy have already been exhausted. [DE 38 at ¶¶ 34, 36-37].

---

[11] At the hearing on the instant motions, counsel for King presented that "the question her ultimately boils down to whether Ms. King on the record as it existed as of September 2023 has established by a preponderance of the evidence that she remained disabled … as a result of her *physical conditions*." [DE 50 at 7: 23-25, 8:1-3] (emphasis added).

B. Dr. Lombard

During the relevant time period, Dr. Lombard was King's treating psychologist. [DE 39 at ¶ 31]. King relies on treatment notes from four visits, two that occurred in 2020 and two that occurred in 2022. [DE 39 at 30]. The Court finds the visits in 2020 to be largely irrelevant given that they took place outside of the relevant time frame. Nonetheless, upon review, they do not seem to support King's proposition. In fact, in a note dated September 14, 2020, Dr. Lombard reported that King's "[c]ognitive functioning and find of knowledge" appeared to be "*intact and age appropriate* [although] thought to be below pre surgery functioning." [*Id*. at 1114] (emphasis added). The note also indicated that her short-term memory may be influenced but that her long-term memory was intact. [*Id*.]. Her processing appeared slow, but her speech, although slow, was articulate, coherent, and spontaneous. [*Id*.]. There is nothing in the 2020 notes relied upon to suggest that her physical limitations were causing her cognitive impairments.

Notes from the August 30, 2022 visit indicate that King's orientation, motor activity, memory, speech, behavior, insight, judgment, thought process, perception, and overall functional status were within normal range as Dr. Lombard noted them to be either "appropriate", "unremarkable", "normal", "fair", or "intact". [DE 37-9 at 1092]. The only aspects of her "mental status" that were remarkable were her mood, attention/concentration, and thought content. [*Id*.]. Dr. Lombard noted that during that visit King was "[w]orried about [her] disability determination and future finances[,] … frustrat[ed] regarding her progress[,] … [that her] [t]hinking still slow an linear[,] [and her] [p]hysical stamina [was] low." [*Id*.]. Dr. Lombard's plan for King moving forward was to "[f]ocus on what she can control; continue behavioral activation – walking; maybe yoga[,] continue CBT[,]" and return for therapy every two weeks. [*Id*. at 1093].

Dr. Lombard's treatment notes from the December 13, 2022 were almost identical. *See* [DE 37-9 at 1132]. Every area of King's "mental status" remained the same as in August 2022.

13

[*Id*.].  King's stress regarding her disability determination, finances, and progress remained the same. [*Id*.].  The treatment notes reflect that King was also overwhelmed with anxiety about the future, yearned for stability, experienced low physical and cognitive stamina, and was exhausted by Thanksgiving. [*Id*.].  Dr. Lombard's treatment plan for King remained the exact same with only the addition of "look for opportunities for stability." [*Id*. at 1133].

Reliance points to one of King's more recent visits, within the record, that occurred on April 4, 2023, which reflects the exact same "mental status" for King that she had in December 2022.  [DE 37-9 at 629].  During that visit, King indicated that she was going to visit her grandfather but was nervous to fly. [*Id*.].  Dr. Lombard's' course of treatment did not change from December 2022, in that she recommended that King "continue CBT – reframe cognitions and focus on what she can control[.]" [*Id* at 630].  Reliance argues that there is no evidence that King's condition deteriorated or that the focus shifted from King's depression and anxiety to any neurocognitive complaints before May 5, 2023, the last treatment note available in the closed Administrative Record. [DE 38 at 33-34].  The Court agrees with Reliance. None of relied upon treatment notes from Dr. Lombard directly connect her physical condition to her cognitive dysfunction. In fact, none of the treatment notes even reference her hormonal deficits, the alleged cause of her cognitive dysfunction and chronic fatigue.

### III. Medical Opinion Forms

*A. Treating Doctors*

The Administrative Record contains the medical opinion forms of King's treating physician, Dr. Jakacki, and treating psychologist, Dr. Lombard.  Looking to Dr. Jakacki's form first, on March 20, 2023, he opined that King's limitations and restrictions were caused by a neurocognitive disorder due to a medical condition, not a mental condition. [DE 37-9 at 1055].  He opined that King's panhypopituitarism and neurocognitive disorder and deficits were associated

with her hormonal deficits, PTSD, depression, panic and anxiety exacerbating underlying genetic predispositions. [*Id*]. Dr. Jakacki's opinion form includes nothing beyond stating that conclusion and checking various boxes on the form. *See* [*Id*.]. Reliance claims that Dr. Jakacki's opinion form "confirm[s] that [King's] mental or nervous order is a factor that contributes to [her] limitations." [DE 38 at 36].

Dr. Lombard's medical opinion form dated March 17, 2023, comes to the same conclusion that King's limitations and restrictions are caused by a neurocognitive disorder due to a medical condition, not a mental condition. [DE 37-9 at 1160]. When asked to support this conclusion, based on her "current treatment" of King, Dr. Lombard does not mention any of King's mental diagnoses, which are extremely prevalent in all of Dr. Lombard's treatment notes, but instead explains that King "continues to exhibit neurocognitive deficits following the removal of her pituitary gland" which impact her ability to complete ordinary daily tasks. [*Id*.]. As stated above, none of Dr. Lombard's treatment notes reference King's hormonal deficits or the effect of them. So, to then use the removal of her pituitary gland as the sole reason for King's neurocognitive deficits is not convincing. Dr. Lombard also references an assessment known as "Nelson Denny Reading Test" that King underwent. [DE 37-9 at 1160]. Dr. Lombard reported that "her scores were slightly but not clinically improved [from 2020] in Vocabulary and Reading Comprehension but remained significantly clinically impaired in her reading rate – two standard deviations below her current ability and perhaps three standard deviations below her premorbid functioning. [*Id*.]. Reliance points out that this reference test does not appear anywhere in the record. [DE 45-1 at 24].

The Court agrees with Reliance: Dr. Jakacki and Dr. Lombard "cannot be permitted to present one rationale in their treatment records and another in their disability claim statements." [DE 38 at 36]. Not to mention, "thorough and reasonable explanations for their determinations"

are necessary, and that is not present here. *Black v. Long Term Disability Ins.*, 582 F.3d 738, 746 (7th Cir. 2009) (holding that it was appropriate to rely on the consulting physicians' conclusions regarding the employee's disability status as they "presented thorough and reasonable explanations" for them).  The Court finds the treating doctors' medical opinion forms to be lacking the necessary rationale, causing their conclusions to be less persuasive.

*B. Nurse Consultants*

Reliance hired various nurse consultants to review King's claim, including Mary Jane Gray, Remar Q. Casuyon, and Patricia Toth. [DE 39 at 31].  RN Gray and Casuyon's reviews, although favorable to King, were conducted in 2019 and 2020. [DE 37-1 at 201-204].  Also, RN Toth's review was conducted on June 8, 2022, about two months prior to the beginning of the relevant time period. [*Id*. at 205].  Therefore, the Court finds it irrelevant to consider these outdated findings in deciding the instant motions.

There is, however, an additional nurse consultant, RN Renee Phillips, who conducted a review on August 17, 2022.  [DE 37-1 at 206].  She determined that "[b]ased upon the available clinical information and form a physical perspective, there is no indication of residual or recurrent pituitary ademoa … [therefore] no indication of an impairing physical condition." [*Id*.].  King claims that Phillips came to this determination "simply because updated diagnostics showed no indication of residual pituitary adenoma recurrence or regrowth," and that she "ignored, without explanation, the portions of [] King's medical records showing she continued to experience ongoing fatigue and cognitive issues because of hormonal balances and her neurocognitive disorder." [DE 39 at 28, 34]. Therefore, King asks the Court to find Phillips' opinion form to be unreliable and insufficient to support a finding that King's claim for physical disability is unsupported." [DE 39 at 34].

Reliance does not directly respond to King's argument regarding RN Phillips' findings, however, RN Phillips does state that she based her findings on relevant treatment notes and briefly summarized Dr. Jakacki's treatment notes, as well as King's neurosurgeon's and neurologist's findings. [DE 37-1 at 206].

While "ERISA does not suggest that … special deference [should be given] to treating physicians' opinions[,]" this Court can appreciate how a treating doctor, such as Dr. Jakacki or Dr. Lombard, may be in a better position to opine on King's condition. *Williams v. Reliastar Life Ins. Co.*, 2008 WL 187536, at *7 (S.D. Ind. Jan. 17, 2008) (citing *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 831 (2003). With that being said, if King wants the Court to accept that Phillips' opinion should be discredited because it was reached without explanation, then the same would certainly go for Dr. Jakacki's findings in his March 20, 2023 Medical Opinion form, where he included no substantiation for his conclusion. *See* [DE 37-9 at 1055-1057]. In any event, the Court agrees with RN Phillips insofar as the treatment notes of Dr. Jakacki and Dr. Lombard fail to establish that King's debilitation symptoms are the result of "an impairing physical condition." [DE 37-1].

**IV. The Social Security Administration's Determination**

Next, King claims the 2020 disability determination by the Social Security Administration ("SSA") bolsters the argument that her physical condition is the cause of the "restrictions and limitations [that] preclude her from performing the essential duties of any occupation for which she is qualified by education, training or experience." [DE 39 at 31-32]. In making her decision, the administrative law judge ("ALJ") relied on 2019 and 2020 treatment notes authored by Dr. Jakacki and Dr. Lombard as well as the findings of an impartial vocational expert, Charles H. McBee. [DE 37-8 at 271-274]. King claims that the ALJ "approved [her] claim … based on a finding that her neurocognitive disorder, rather than her behavioral health conditions, resulted in

17

impairments that met the criteria of Section 12.02 of Social Security's Listing of Impairments." [DE 47 at 8].

Reliance argues just the opposite, that the ALJ's findings do establish that King's behavioral, or mental, health significantly contributed to her disability. [DE 45-1 at 12].  Reliance also points out that there is no evidence that the "Social Security Administration evaluated [King] in or about August 17, 2023, when Reliance [] discontinued benefits." [*Id*.].

The Seventh Circuit has made clear that a "Social Security decision is only one more factor for consideration in an ERISA benefits determination." *Dorris v. Unum Life Ins. Co. of Am.*, 949 F.3d 297, 305 (7th Cir. 2020) (internal citations omitted); *see Tegtmeier v. Midwest Operating Eng'rs Pension Tr. Fund*, 390 F.3d 1040, 1046 (7th Cir. 2004) (explaining that "Social Security decisions, if available, are instructive, [but] these determinations are not dispositive"). One reason being that the "Social Security Act's disability standard is different from that in the ERISA plan[.]" *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 610 (7th Cir. 2007).

The Court finds that the 2020 SSA decision undermines King's argument. Not only was the decision made years prior to the relevant time period[12], but like a majority of record before this Court, nothing in the decision directly links King's debilitating limitations and restrictions to her physical condition. *See generally* [DE 37-8 at 271-274].  In fact, the decision verbatim states, "given that the disability is established when considering mental impairment alone, the Administrative Law Judge finds it *unnecessary to assess physical function*." [DE 37-8 at 272]

---

[12] In responding to Reliance's claim that there is no evidence that the SSA's decision was ever reevaluated after 2020, King claims that the record "confirms [that] the Social Security Administration reevaluated Ms. King's eligibility for benefits in 2023. AR 1794, 3171, 3173, 3175." [DE 47 at 8]. However, the documents within the record that she cites are the last page of the 2020 SSA decision and various treatment notes authored by Dr. Lombard in March and April 2023.  *See* [DE 37-9 at 274, 1148, 1150, 1152]. Therefore, for purposes of deciding the instant motions, the Court will presume that the 2020 decision was never reevaluated, as there is no evidence to support that it was.

(emphasis added). For these reasons, the Court that finds the 2020 SSA Decision does not weigh in favor of a finding that King's symptoms are caused by a physical condition.

## V. Other Evidence

Finally, the nonmedical evidence that is before the Court is a vocational evaluation conducted by Ashley H. Johnson, MS, CRC, CLCP, and King's own conduct – specifically a trip taken to visit her grandfather. [DE 39 at 8]; [DE 45-1 at 22].

Ashley Johnson completed a vocational evaluation of King on May 9, 2023. [DE 37-9 at 1309).  In doing so, she relied on documentation from the Social Security Administration, Medtronic, questionnaires from Dr. Lombard and Dr. Jakacki, and excerpts from Ms. King's Long Term Disability Insurance Policy." [*Id*. at 1309]. Johnson concluded that King "is unable to perform her regular occupation, or any occupation, as a result of her symptoms and limitations." [*Id*. at 1312].  But this conclusion is inapposite to the issue before the Court. There is no dispute that King is disabled, and unable to perform her regular occupation, or any occupation. Again, the issue is whether the evidence before the Court supports a finding that King was Totally Disabled by way of a *physical condition* during the relevant time period.

Lastly, Reliance argues that King's claim is "belied by [her own] documented activities." [DE 45-1 at 22]. In April 2023, King went to Florida to "care for [her grandfather." [DE 37-9 at 627]; *see also* [*Id*. at 496, 629]. Reliance claims that King's inability to work in any capacity and her ability to travel to Florida to allegedly "care" for her grandfather cannot coexist. [DE 45-1 at 22].  This argument holds no water. There is no evidence in the record that describes what King's alleged care entailed. And as King pointed out, "the Seventh Circuit [has] concluded that the claimant's ability to do some activities at home did not establish that he could do a full-time job." *Hillock v. Cont'l Cas. Co*., 2004 WL 434217, at *6 (N.D. Ill. Mar. 2, 2004) (*citing Hawkins v. First*

*Union Corp. Long-Term Disability Plan,* 326 F.3d 914 (7th Cir.2003)). Nonetheless, the inquiry before this Court is not whether King is disabled and unable to perform work in any capacity. The inquiry is whether a physical condition causes her limitations and restrictions. Accordingly, King's alleged "care" for her grandfather is immaterial.

### Conclusion

The Court has gone through a thorough analysis of the evidence contained in the Administrative Record for the relevant time period. As discussed above, the treatment notes, medical opinion forms, SSA decision, vocational evaluation, and other evidence simply do not directly link King's physical condition to her debilitating symptoms. The Court finds it important to make clear that in coming to this conclusion, it is not making a finding that King is not disabled, because that is not the relevant question. Rather, it is finding that there is insufficient evidence contained in the Administrative record to conclude that between August 17, 2022 and September 14, 2023, King's "Total Disability" was caused by a "[physical] Injury or Sickness …[,]" as defined by the Policy. [DE 37, pg. 10; DE 39 at ¶ 1].

For these reasons, King's Motion for Summary Judgment [DE 39] is **DENIED**, and Reliance's Motion for Judgment on the Administrative Record [DE 38] is **GRANTED**. Accordingly, the Clerk is **DIRECTED** to enter judgment in favor of Reliance and against King. This case is now closed.

SO ORDERED.

ENTERED: March 31, 2026

/s/ GRETCHEN S. LUND
Judge
United States District Court

20